# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE LEVAQUIN PRODUCTS LIABILITY LITIGATION | MDL No. 08-1943 (JRT) |
| ––––––––––––––––––––––––––––– | ––––––––––––––––––––––––––––– |
| CLIFFORD STRAKA, | Civil No. 08-5742 (JRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL** |
| JOHNSON & JOHNSON, and JANSSEN PHARMACEUTICALS, INC., | |
| Defendants. | |

Ronald S. Goldser and David M. Cialkowski, **ZIMMERMAN REED, PLLP**, 1100 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; and Lewis J. Saul and Kevin M. Fitzgerald, **LEWIS SAUL & ASSOCIATES**, 183 Middle Street, Suite 200, Portland, ME 04101, lead counsel for plaintiff Straka.

Tracy J. Van Steenburgh and Dana M. Lenahan, **NILAN JOHNSON LEWIS, PA**, 120 South Sixth Street, Suite 400 Minneapolis, MN 55402; James B. Irwin, **IRWIN FRITCHIE URQUHART & MOORE, LLC**, 400 Poydras Street, Suite 2700, New Orleans, LA 70130; William V. Essig, **DRINKER BIDDLE & REATH LLP**, 191 North Wacker Drive, Suite 3700, Chicago, IL 60606, lead counsel for Defendants.

Plaintiff Clifford Straka brought claims against defendants Johnson & Johnson and Janssen Pharmaceuticals, Inc. for failure to warn about certain risks involved in taking Levaquin, specifically the risk of tendon rupture. His case was the third tried in multi-district litigation involving numerous plaintiffs. The jury found that Defendants failed to adequately warn Straka's prescribing physician of the risks associated with Levaquin but

that Defendants' failure to warn was not a direct cause of Straka's injuries. Straka now moves for a new trial claiming that the jury's verdict is against the weight of the evidence; that the Court should have excused one of the jurors after she became aware of a business connection with Defendants; and that the Court erred in refusing to give instructions on Straka's theory that Defendants violated Minnesota's senior citizen protection law. Straka also moves for a suspension of the judgment to allow him to bring a motion for civil penalties resulting from violation of Minnesota's consumer protection statutes. The Court will deny both of these motions.

## BACKGROUND

*Underlying Events*

In March 2006, while visiting Arizona, Straka began having symptoms of an upper respiratory infection or inflammation. After taking a course of antibiotics and a course of steroids, on March 27 Straka saw Dr. Katayoun Baniriah. Dr. Baniriah diagnosed Straka with pneumonia and prescribed ten-days of the antibiotic Levaquin. On March 31, Dr. Baniriah saw Straka for a follow-up appointment, and she documented that his breathing and energy levels had improved but recommended that Straka see his physician in Minnesota upon his return home. Straka returned to Minnesota on April 3, day eight of his ten-day course of Levaquin.

As he was getting off the plane in Minnesota, late in the evening on April 3, Straka first noted the pain in his ankles, and he began limping. The next day, April 4, Straka saw a physician to follow up on his pneumonia. Straka reported the pain in his ankles

and the doctor advised Straka to immediately discontinue Levaquin and restrict his activities.

In early May 2006, Straka stepped off a curb and felt a sharp pain in his left ankle. In mid-May, Straka saw an orthopedic surgeon, Dr. Lisa Wasserman who diagnosed Straka with a tear in his left Achilles tendon and prescribed the use of a boot. Dr. Wasserman saw Straka again in early July 2006 and recommended that he transition from the boot to a shoe. Straka began seeing a physical therapist, Rickie Walkden, during this period to assist with his recovery. On July 27, 2006, Straka again visited Dr. Wasserman, this time complaining of pain in his right ankle. Dr. Wasserman diagnosed Straka with a tear in his right Achilles tendon and again prescribed the use of a boot.

*Trial*

During trial, Straka presented evidence that Defendants failed to adequately communicate the risks of Levaquin to physicians (either by the warning's placement in the label or other means) and that Defendants failed to warn about the increased risks of Levaquin compared to other drugs in the same family (i.e. other fluoroquinolones). In addition to rebuttal evidence, Defendants presented evidence that Dr. Baniriah could not remember reading the Levaquin label and did not learn of the tendon-associated risks of Levaquin until well after the black box warning was added and a Dear Doctor letter was distributed. Defendants also presented testimony from both Straka and his physical therapist about Straka's exercise regimes, both before and after the diagnosis of each

tendon rupture. In addition, Defendants presented evidence about Straka's steroid use and testimony that steroid use can contribute to tendon injury without the use of Levaquin.

*Juror's Employment*

After several weeks of trial but before deliberations began, Juror Biorn disclosed to the Court that her company, BMI, does work for Reed Group, the disability insurance carrier for Johnson & Johnson. (*See* Tr. at 2712:9-13.) Juror Biorn became aware of this connection when she returned to her office on a day the Court was not in session. (*Id.* at 2563:11-21, 2711:13-2712:1.) While Juror Biorn was reviewing her schedule with her human resources manager, the manager remarked that Johnson & Johnson was in the caption on the schedule and "made reference of that," saying "I'm surprised he didn't pull you from having a conflict for the fact that we support J&J business." (*Id.* at 2711:17-23.) Juror Biorn could not recall having ever worked on a Johnson & Johnson case, and she indicated that she was unaware what proportion of her work came from Reed Group and what proportion of Reed Group's claims came from Johnson & Johnson. (*Id.*) When asked if her company's connection with Johnson & Johnson would affect her ability to be fair and impartial, Juror Biorn said no. (*Id.* at 2714:21-25.) Straka moved to remove Juror Biorn on the ground that knowledge of her connection to Johnson & Johnson would have affected the way he used his preemptory strikes. (*Id.* at 2578:13-16, 2717:4-5.) The Court denied the motion because it found Juror Biorn's connection to be

attenuated and because she averred her ability to be fair. (*Id.* at 2718:3-8.) Straka argues that Juror Biorn should have been excused from the jury.

*Jury Instructions*

Straka's complaint alleged that Defendants had violated Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.69, Minnesota's Unfair and Deceptive Trade Practices Act, Minn. Stat. §§ 325D.13, 325D.44 *et seq.*, and Minnesota's False Advertising Act, Minn. Stat. § 325F.67, and therefore that Straka was entitled to recover an additional civil penalty under Minnesota's Senior Citizen and Handicapped Person Consumer Fraud Act ("SCHPCFA"), Minn. Stat. § 325F.71.[1] (*See* Compl. ¶¶ 171, 177, Oct. 15, 2008, Docket No. 1.)[2] Straka argued at trial that the SCHPCFA established an independent cause of action and asked for a jury instruction regarding Defendants' violation of the Act. The draft instruction told the jury to find a violation of the SCHPCFA if Defendants violated Minnesota's Consumer Fraud Act (a still pending claim), Minnesota's Deceptive Trade

---

[1] "In addition to any liability for a civil penalty pursuant to sections 325D.43 to 325D.48, regarding deceptive trade practices; 325F.67, regarding false advertising; and 325F.68 to 325F.70, regarding consumer fraud; a person who engages in any conduct prohibited by those statutes, and whose conduct is perpetrated against one or more senior citizens or disabled persons, is liable for an additional civil penalty not to exceed $10,000 for each violation . . . ." Minn. Stat. § 325F.71, subd. 2(a).

[2] "Pursuant to Minn. Stat. § 325F.71, subd. 4, Plaintiff is entitled to recover all damages arising out of Defendants' violation of Minn. Stat. § 325F.44, subdiv 1, (5) and/or (7), §325F.67, and/or Minn. Stat. § 325F.69, subdiv. 1." (Compl. ¶ 177.) "Minn. Stat. §325F.71, subd. 2 incorporates Minn. Stat. . . . § 325F.68-70 regarding consumer fraud and provides special remedies if violations of those statutes are directed against senior citizens or handicapped people[.]" (*Id.* ¶ 171.)

Practices Act (a claim that had been dismissed),[3] or Minnesota's False Advertising Act (a claim that had been dismissed). The Court ruled that the SCHPCFA was derivative of Straka's Consumer Fraud Act claim and thus declined to include the requested instruction. Straka argues that the Court committed error by refusing to give this instruction and moves for a new trial in which the Court includes the instruction.

*Jury's Verdict*

After three weeks of trial and two days of deliberations, the jury reached a verdict. Although the jury found that Defendants had failed to warn Straka's prescribing physician of the risks associated with Levaquin,[4] it found that Defendants' failure was not the direct cause of Straka's injuries.[5] The jury also found that Defendants had not violated the Consumer Fraud Act.[6] Consequently, the jury awarded no damages to Straka. Straka argues that the jury's causation verdict is against the preponderance of the evidence and that the Court should exercise its discretion to order a new trial.

---

[3] Straka dismissed his claims under Minnesota's Unfair and Deceptive Trade Practices Act, Minn. Stat. §§ 325D.13 and 325D.44 *et seq.*, and Minnesota's False Advertising Act, Minn. Stat. § 325F.67, before trial. (Stipulation, Dec. 2, 2011, Docket No. 58.)

[4] The Jury answered "YES" to "Question 1: Did defendants fail to provide reasonably adequate warnings of the risks associated with Levaquin to plaintiff's prescribing physician . . . ?" (Special Verdict Form, Jan 26, 2012, Docket No. 240.)

[5] The Jury answered "NO" to "Question 2: Was defendants' failure to warn plaintiff's prescribing physician a direct cause of plaintiff's injuries?" (Special Verdict Form.)

[6] (Special Verdict Form, Question 4.)

# DISCUSSION

## I. STANDARD OF REVIEW

### A. Motion for a New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, the Court may grant a motion for a new trial "on all or some of the issues . . . ." Fed. R. Civ. P. 59(a)(1). "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence . . . or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). "The authority to grant a new trial is within the discretion of the district court." *Id.* Straka moves for a new trial on the grounds that (1) the jury's verdict is against the weight of the evidence; (2) the Court committed a legal error when it declined to excuse Juror Biorn; and (3) the Court erred in refusing to give the instructions on Straka's theory that Defendants violated Minnesota's senior citizen protection law.

### B. Motion to Alter or Amend the Judgment

Federal Rule of Civil Procedure 59(e) permits a motion to alter or amend a judgment no later than 28 days after it has been entered. Rule 59(e) motions "serve the limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Wells Fargo Bank, N.A. v. WMR e-Pin, LLC*, 653 F.3d 702, 714 (8th Cir. 2011) (quotation marks and citation omitted). "Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment." *United States v. Metro. St. Louis*

*Sewer Dist.*, 440 F.3d 930, 933 (8th Cir. 2006) (quotation marks and citation omitted). Straka moves the Court to suspend the judgment and reopen the case to allow him to bring a motion for a civil penalty because, he argues, the jury's finding that Defendants failed to adequately warn of Levaquin's risks establishes a violation of Minnesota's consumer protection statutes.

## II. VERDICT'S EVIDENTIARY SUPPORT

Straka first moves for a new trial on the ground that the jury's verdict is against the weight of the evidence because the jury's holding that Defendants breached their failure to warn is inconsistent with their determination that Defendants' failure to warn Straka's prescribing physician was not a direct cause of Straka's injuries.

With regard to the weight of the evidence, a new trial is warranted if "the verdict was against the great, clear, or overwhelming weight of the evidence." *Frumkin v. Mayo Clinic*, 965 F.2d 620, 625 (8th Cir. 1992). Further, only if the jury's verdict is so against the great weight of the evidence that it constitutes a miscarriage of justice should a motion for a new trial be granted. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000). "On a motion for new trial, the district court is entitled to interpret the evidence and judge the credibility of witnesses, but it may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable." *Manus v. Am. Airlines, Inc.*, 314 F.3d 968, 973–74 (8th Cir. 2003) (quotation marks and citation omitted); *see also Harris v. Sec'y, U.S. Dep't of the Army*, 119 F.3d 1313, 1318 (8th Cir. 1997) ("In determining whether a verdict is against the weight of the

evidence, the trial court . . . can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict. The district court, however, may not reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." (internal quotation marks and citations omitted)).

In products liability cases involving drug side effects, the plaintiff must establish (1) that the drug was capable of causing the plaintiff's injury (general causation); (2) that the drug did, in fact, cause the injury (specific causation); and (3) that a different label or warning would have avoided the plaintiff's injuries (proximate or direct causation). *Meade v. Parsley*, No. 2:09-CV-00388, 2010 WL 4909435, at *5 (S.D. W. Va. Nov. 24, 2010); *see also In re Prempro Prods. Liab. Litig.*, 586 F.3d 547, 565 (8th Cir. 2009) (noting that as part of a failure to warn claim the plaintiff was required to show specific and proximate causation). The parties do not contest that Levaquin could have caused Straka's tendon ruptures (general causation). The Court will examine whether the jury's verdict could be the result of its finding insufficient proof of either specific causation or proximate causation.

### A. Specific Causation

The plaintiff bears the burden of establishing that Levaquin did, in fact, cause Straka's injury (specific causation). During the trial, Defendants presented evidence of potential non-Levaquin causes of Straka's Achilles tendon ruptures. Defendants

suggested that Straka's left Achilles tendon rupture could have been the result of aggressive exercise or trauma, and produced a range of evidence to support their theories, including the following: Walkden's patient note that Straka was "walking and slipped and tore the left Achilles tendon 90 percent" (Tr. at 603:3-5); Dr. Wasserman's note indicating that Straka's tendon injury occurred when he "stepped awkwardly off a curb" (Aff. of Dana M. Lenahan, Apr. 20, 2012, Ex. I, Docket No. 255); Dr. Zizic's testimony that spontaneous trauma could have caused Straka's left tendon rupture (Tr. at 1369:11-1370:2); and records of Straka's visits to his health club.

Defendants suggested that Straka's right Achilles tendon rupture could have been the result of aggressive exercise and physical therapy, and presented the following evidence to support their theory: Walkden's patient note that Straka was doing lunges (Tr. at 703:12-16), an activity one of Straka's physicians said he would not recommend at that stage of recovery (Tr. at 120:10-21); evidence of other physical therapy and activity, such as heel raises (*see, e.g.*, Tr. 710:22-711:17); evidence of Straka's ongoing steroid use (*see* Tr. at 1362:22-1363:9); and records of Straka's visits to his health club.

Straka, by contrast, provided evidence to support his theory that Levaquin caused his Achilles tendon rupture. Both Straka and Walkden testified that there had been no trauma. Dr. Zizic testified that Levaquin is "a substantial contributing factor to tendinopathy by the damaging of the tendons . . ." (Tr. at 1291:10-18; 1293:23-1294:7); that trauma was not a cause of Straka's Achilles tendon tears (Tr. 1315:8-12); and that Levaquin, at Straka's dosage, was "a substantial contributing factor" in his bilateral tendon ruptures (Tr. 1315:18-1316:4). Plaintiffs also entered as evidence the medical

records of Straka's treating physicians, which suggested Levaquin was the cause of his tendon ruptures. (summarized at Pl.'s Mem. in Supp. at 21-22, Mar. 16, 2012, Docket No. 251.)

The Court concludes that there was sufficient evidence presented at trial to support the jury's finding that Straka's tendon injuries were caused by something other than Levaquin. That is, the above-reviewed evidence offered the jury a sufficient basis to reach "different inferences or conclusion" about the specific cause of Straka's tendon injuries, and the Court will not reweigh the evidence to reach a different conclusion. *See Harris*, 119 F.3d at 1318.

### B. Proximate or Direct Causation

The plaintiff must also establish that a different label or warning would have avoided the plaintiff's injuries (proximate causation). The jury's verdict could, therefore, be supported by evidence that a different label or warning would not have changed Dr. Baniriah's decision to prescribe Levaquin to Straka.

Dr. Baniriah testified that – even though Defendants added a black box warning to the label and issued a Dear Doctor letter several years ago – she only learned of Levaquin's association with tendon injuries in the past year or two. (Tr. at 476:14-20.) Dr. Baniriah also testified that if she had looked at the label at the time of Straka's prescription, the warning – as it was written at the time – would have caught her attention. (Tr. at 475:15-21.) Although Dr. Baniriah testified that if she had known about the increased risk of tendon disorders when Levaquin was prescribed

concomitantly with steroids, she "most likely [would have] prescribed another antibiotic" (Tr. at 424:21-425:9), no testimony shows that Dr. Baniriah would have read a different warning or otherwise become aware of it. The Court therefore finds that the jury could reasonably have found that even if Defendants had provided a different label or additional warnings, Dr. Baniriah still would have prescribed Levaquin.

This conclusion is not inconsistent with *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978 (8th Cir. 1969) and *Sterling Drug v. Cornish*, 370 F.2d 82 (8th Cir. 1966), which Straka reads too broadly.[7] In *Yarrow* and *Cornish*, the circuit court addressed **only** whether the warning was adequate; it did not address the issue of proximate causation.[8] Moreover, Straka's theory that an inadequate warning automatically leads to liability is inconsistent with more recent Minnesota law.[9] Indeed, this Court has previously noted

---

[7] Straka suggests that *Yarrow* and *Cornish* stand for the proposition that "once the jury determines that a drug manufacturer has failed to make reasonable efforts to attract the doctor's attention, the manufacturer is liable regardless of anything the doctors may or may not have done . . . ." (Pl.'s Reply Mem. at 3, May 4, 2012, Docket 273 (internal quotation marks omitted).)

[8] In *Yarrow*, the court held that when "detail men," on whom the prescribing physician relied for drug information, provided information about the drug but offered **no** warnings about its dangers, the warnings were inadequate. 408 F.2d at 991-92. In *Cornish*, the "**sole issue** was whether appellant negligently failed to make reasonable efforts to warn appellee's doctors." 370 F.2d at 85. There was "no question of intervening proximate cause in [that] case." *Id.* Neither case precludes an intervening cause from being an issue in another drug product liability case.

[9] *See, e.g.*, *Johnson v. Zimmer, Inc.*, No. 02-1328, 2004 WL 742038, at *9 (D. Minn. Mar. 31, 2004) ("[W]here an adequate warning could not have prevented a plaintiff's injuries, causation does not exist as a matter of law."); *Balder v. Haley*, 399 N.W.2d 77, 81 (Minn. 1987) (where warnings are ignored, there is no causal relationship between the failure to warn and the injury); 27 Minn. Practice Series, Products Liability § 16.7 ("Even if a warning is inadequate, the manufacturer is not liable for failure to warn . . . if the physician would have prescribed the drug or device regardless of any additional information or warnings the manufacturer could have supplied.")

that "'[i]f a legal duty to warn is found, the factual issues of the adequacy of the warning, breach of the duty, **and** causation are . . . considered by the factfinder.'" *In re Levaquin Prods. Liab. Litig.*, 726 F. Supp. 2d 1025, 1034 (D. Minn. 2010) (emphasis added) (quoting *Johnson*, 2004 WL 742038, at *9).

Finally, Straka offered multiple theories that Defendants failed to warn. Straka argued at trial that Defendants failed to warn by (1) not communicating the changed warning in the label and (2) not including in the label comparative toxicity information. Because Straka cannot rule out the possibility that the jury based its failure-to-warn determination on Defendants' failure to include comparative toxicity information in the label, the jury was free to find that Dr. Baniriah would have prescribed the drug even if that additional information were included.[10]

In sum, the Court concludes that the jury had adequate evidentiary support to find that (1) Levaquin was not the specific cause of Straka's tendon injuries and (2) a different label or warning would not have changed Dr. Baniriah's prescription of Levaquin to Straka. Because either of these findings would support the jury's verdict that Defendants breached their duty to warn but that Defendants' failure to warn Straka's prescribing physician was not a direct cause of Straka's injuries, the verdict is not against the weight of the evidence. The Court will deny Straka's motion for a new trial on this ground.

---

[10] If the jury had specifically found that Defendants failed to warn by inadequately communicating the changed warning, then, as in *Cornish*, evidence that a different label or warning would not have changed the doctor's decision to prescribe Levaquin might not be an issue. But it did not.

## III.  JUROR BIORN'S EMPLOYMENT

Straka next argues that the Court should grant its motion for a new trial because the Court denied its motion to excuse Juror Biorn after she disclosed that her employer provides services to Johnson & Johnson's disability insurance carrier.  Straka does not present any evidence of actual bias but instead argues that the doctrine of implied bias required the Court to strike Juror Biorn.

The doctrine of implied bias (also referred to in some cases as "implicit bias") requires a court to strike a juror in "'extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" *Sanders v. Norris*, 529 F.3d 787, 792 (8th Cir. 2008) (quoting *Person v. Miller*, 854 F.2d 656, 664 (4th Cir. 1988)).  Eighth Circuit case law is inconsistent with regard to whether juror bias may be implied, *see Sanders*, 529 F.3d at 791 (acknowledging but declining to resolve the inconsistency),  but even circuits that have recognized the doctrine of implied bias limit the applicability of the doctrine to "extreme," "extraordinary," or "exceptional" circumstances.[11]

Even if implied bias is sometimes applicable, Juror Biorn's circumstances do not warrant it here because they are not "extreme," "extraordinary," or "exceptional."  Juror

---

[11] *See United States v. Brooks*, 569 F.3d 1284, 1289 (10th Cir. 2009); *Fields v. Brown*, 503 F.3d 755, 766, 769, 771 (9th Cir. 2007); *Conaway v. Polk*, 453 F.3d 567, 587 n.21 (4th Cir. 2006); *Johnson v. Luoma*, 425 F.3d 318, 326 (6th Cir. 2005); *Solis v. Cockrell*, 342 F.3d 392, 396 (5th Cir. 2003); *United States v. Greer*, 285 F.3d 158, 172 (2d Cir. 2000); *Amirault v. Fair*, 968 F.2d 1404, 1406 (1st Cir. 1992); *United States v. Calabrese*, 942 F.2d 218, 226 n.3 (3d Cir. 1991); *Isaacs v. Kemp*, 778 F.2d 1482, 1486 n.7 (11th Cir. 1985).

Biorn did not have the type of financial relationship that would require the Court to presume implied bias: she was not employed by Defendants,[12] or even employed by a company that worked directly for Johnson & Johnson.[13] Nor is it "unlikely that the average person could remain impartial in . . . deliberations" in Juror Biorn's situation.[14] *Sanders*, 529 F.3d at 792. Juror Biorn was sufficiently removed from Johnson & Johnson that she did not realize that her company did any work relating to the Defendants until a co-worker recognized it. The Court concludes that its denial of Straka's motion to strike Juror Biorn was not legal error meriting a new trial.

---

[12] *Cf. Caterpillar, Inc. v. Sturman Indus., Inc.*, 387 F.3d 1358, 1372 (Fed. Cir. 2004) (finding that a juror whose husband worked for the plaintiff at the time of trial should have been struck for cause under the doctrine of implied bias); *United States v. Polichemi*, 219 F.3d 698, 704-05 (7th Cir. 2000) (finding that a fifteen-year employee of the prosecutor's office working the case should have been struck); *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1122 (10th Cir. 1995) (striking a juror for implied bias because the challenged juror owned stock in the defendant's company and his spouse worked for the defendant); *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1468 (10th Cir. 1994) (explaining that implied bias would exist where a juror had a direct financial interest in the trial's outcome, such as through employment by a party).

[13] In contrast, the type of "extreme situations" that warrant a finding of implied bias "include a revelation that a juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." *Allen v. Brown Clinic, PLLP*, 531 F.3d 568, 572-73 (8th Cir. 2008) (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring)).

[14] Straka makes much of the fact that Juror Biorn's coworker said, "I'm surprised [the Judge] didn't pull you from having a conflict for the fact that we support J&J business." The co-worker's opinion does not change the Court's determination that an average person who did not originally know of the connection with Johnson & Johnson and who believed that only a small portion of her company's business came from Johnson & Johnson could remain impartial *See, e.g.*, *United States v. Torres*, 128 F. 3d 38, 45-47 (2d Cir. 1997) (applying an "average man" test to determine implied bias but noting the circuit's refusal to "carve out an overly broad category of presumed bias based on occupational or status relationships").

## IV. SENIOR CITIZEN'S CONSUMER FRAUD ACT CLAIM

Straka argues that the Court erred by refusing to give his instruction on the SCHPCFA and that the Court should grant Straka a new trial in which the instruction is given. As at trial, Straka argues that the SCHPCFA establishes an independent cause of action.[15] The Court ruled that the SCHPCFA creates a derivative claim, and declined to include the requested instruction. (Tr. at 2762-64.)

The Court's ruling is consistent with (at least some of) the language of the act, the Court's prior rulings in this litigation, and existing case law. As the Court noted at trial, the language of the statute is "entirely unclear," but the heading referring to a supplemental civil penalty "is instructive to the Court." (Tr. at 2762-63.) That SCHPCFA claims are derivative is also consistent with the Court's summary judgment order in this case, *In re Levaquin Products Litigation*, No. 08-5742, 2011 WL 6826415, at *5 (D. Minn. Dec. 28, 2011) ("Straka's SCHPCFA claim stands or falls with his claim under the [Consumer Fraud Act]."), and in previous cases in the MDL, *In re Levaquin Products Litigation*, 752 F. Supp. 2d 1071, 1079 (D. Minn. 2010) ("The parties agree that the plaintiffs' SCHPCFA claims stand or fall with their claims under the other Minnesota consumer protection statutes."). Because the SCHPCFA creates a derivative claim, there was no error in the Court's refusal to give an instruction on the SCHPCFA claim. In sum, the Court will deny Straka's Rule 59(a) motion for a new trial because it finds the

---

[15] Straka's position is inconsistent with the position that Plaintiffs previously took in the MDL that SCHPCFA claims are derivative. Indeed, the proposed instruction would have incorporated claims that Straka had agreed to voluntarily dismiss. (*See* Docket No. 58.)

verdict was supported by the evidence, and the Court committed no legal error at trial resulting in a miscarriage of justice.

## V. CIVIL PENALTIES

Straka also moves for a suspension of judgment so that he can bring a motion for a civil penalty for violation of Minnesota's consumer fraud statutes. Straka argues that the jury's determination that Defendants failed to adequately warn of Levaquin's risks supports the Court finding a violation of Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.69; Minnesota's Unfair and Deceptive Trade Practices Act, Minn. Stat. § 325D.44; and Minnesota's False Advertising Act, Minn. Stat. § 325F.67. As described below, the Court finds that Straka has not demonstrated "manifest errors of law or fact" or presented "newly discovered evidence" sufficient to support a suspension of the judgment. *Wells Fargo Bank, N.A.*, 653 F.3d at 714.

### A. Minnesota's Consumer Fraud Act

The jury in its special verdict form found that Defendants had **not** violated Minnesota's Consumer Fraud Act, Minn. Stat. § 325F.69. Nevertheless, Straka asks the Court to find that the jury's determination that Defendants failed to adequately warn of Levaquin's risks amounts to a violation of that Act. A violation of the Consumer Fraud Act required the plaintiff to show "Defendants misrepresented by omission or concealed

material facts regarding Levaquin . . . ." (Jury Instruction No. 22, Docket No. 232.)[16] Equating the jury's answer to Question 1 of the Special Verdict Form with a violation of the Consumer Fraud Act is inconsistent with the jury's answer to Question 3 (the Consumer Fraud Act question) and would improperly read intent into Defendants' conduct that was not implicit in the jury's answer to Question 1.

Straka argues that there "is no requirement that the jury make this determination rather than the Court." (Pl.'s Reply Mem. at 15.) However, the jury was given a chance to make this determination in Question 3 of the special verdict form. The Court concludes the jury's determination was supported by the evidence and that it would be inappropriate to reinterpret the jury's verdict.

B. **Violations under the SCHPCFA**

Straka also claims that the jury's determination that Defendants failed to adequately warn of Levaquin's risks is "sufficient to establish a violation"[17] of Minnesota's Unfair and Deceptive Trade Practices Act and False Advertising Act – and, because Defendants' conduct was perpetrated against one or more senior citizens, this

---

[16] "The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, **with the intent that others rely thereon** in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . . ." Minn. Stat. § 325F.69, subd. 1 (emphasis added).

[17] (*See* Pl.'s Mem. in Supp. at 49.)

Court should impose a civil penalty for each violation under the SCHPCFA. The Court finds that no conduct prohibited by these acts was implicit in the jury's verdict.[18]

Minnesota's Unfair and Deceptive Trade Practices Act defines a series of "deceptive trade practices," including, for example, passing off goods or services as those of another or causing confusion as to the source or certification of goods. *See generally* Minn. Stat. § 325D.44, subd. 1. The jury's answer to the special verdict form does not prove that Defendants engaged in any of the prohibited practices. Minnesota's False Advertising Act prevents a person "with intent to sell" merchandise from distributing a writing that "contains any material assertion, representation, or statement of fact which is untrue, deceptive, or misleading . . . ." Minn. Stat. § 325F.67. Nothing in the jury's answer to Question 1 of the special verdict form or the relevant jury instructions indicates that Defendants' failure to warn was necessarily the result of "untrue, deceptive, or misleading" statements. The Court concludes that Straka has not shown how the jury's verdict supports a violation of any of the statutes that would establish liability under the SCHPCFA. In sum, the Court will deny Straka's Rule 59(e) motion because it does not present new evidence or identify a manifest error of law.

---

[18] The Court also finds it troubling that Straka is attempting to use a post-trial motion to revive claims that were voluntarily dismissed before trial. "Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment." *Metro. St. Louis Sewer Dist.*, 440 F.3d at 933.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Clifford Straka's Motion to Alter or Amend the Judgment [Docket No. 246] is **DENIED.**

2. Clifford Straka's Motion for a New Trial [Docket No. 244] is **DENIED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 28, 2012                  ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                     JOHN R. TUNHEIM
                                                        United States District Judge